UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ANDREW REID WALTER, | 4:17-CV-04110-KES |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| NANCY A. BERRYHILL,[1] Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security, | |
| Defendant. | |

## INTRODUCTION

Plaintiff, Andrew Reid Walter, seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II of the Social Security Act.[2]

———————————

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security. The revised title is necessary until the President appoints another executive to serve as Acting Commissioner, or there is a nominee for the position of Commissioner of Social Security, at which time the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3346(a)(2), would allow Nancy Berryhill to resume the position of Acting Commissioner of Social Security while the nomination is pending.

[2] SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference–greatly simplified-is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the

Mr. Walter has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Mr. Walter requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge pursuant to 28 U.S.C. § 636(b) and the February 27, 2018, order of the Honorable Karen E. Schreier, district judge.

## FACTS[3]

### A.    Statement of the Case

This matter arises from Mr. Walter's application for SSD benefits filed on April 8, 2016, alleging disability commencing on November 1, 2009. AR169.

---

claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). In this case, Mr. Walter filed his application for SSD benefits only. AR 13. His coverage status for SSD benefits expired on December 31, 2014. AR 13, 124. In other words, in order to be entitled to Title II benefits, Mr. Walter must prove he was disabled on or before that date.

[3] This factual recitation is gleaned primarily, but not exclusively, from the detailed fact section contained within the plaintiff's brief. Docket 11. The Commissioner does not dispute the facts contained within the plaintiff's brief. Rather, the Commissioner argues the facts were properly interpreted by the ALJ, while the plaintiff argues the ALJ did not properly interpret the facts.

Because both parties rely upon the medical reports and records from the Veteran's Administration medical providers to support their positions, the court has discussed portions of those records in some detail based upon its own review of the administrative record.

2

Following denial of his claim, initially and upon reconsideration, Mr. Walter requested a hearing which was held on March 22, 2017, before Administrative Law Judge ("ALJ") Michael Balter.  AR104, 126.  In the decision, ALJ Balter confirmed Mr. Walter was insured for benefits through December 31, 2014.  AR15.

In the unfavorable decision dated April 3, 2017, the ALJ denied Mr. Walter's claim, finding that he suffers from "right knee chondromalacia and meniscal tear, status post arthroscopic surgery; chronic fatigue syndrome, residuals of traumatic brain injury ("TBI"); post-traumatic stress disorder; and depression," which are severe impairments.  AR10-27.  The ALJ concluded that Mr. Walter cannot perform his past relevant work as a computer support specialist but retains the residual functional capacity ("RFC") to perform other jobs, i.e., electronics worker and assembler, small products.  AR25-26.  Thus, the ALJ rejected Mr. Walter's assertions and severity of his symptoms associated with his post-traumatic stress disorder (PTSD) and depression in that he is preoccupied by intrusive thoughts and rumination, memory loss, poor concentration, irritability, and other symptoms that prevent him from working.  AR13-27.

In reaching his conclusions, the ALJ relied on vocational expert testimony and rejected the contrary opinion of Dr. Samuel Bradshaw's compensation and pension examination.  AR392-96.  Instead, he gave "significant weight" to the opinion of the State agency consultants' physical and mental assessments.  AR24.

Mr. Walter requested review of the hearing decision on April 3, 2017, which was denied by the Appeals Council on June 27, 2017.  AR1.  Accordingly, the ALJ's decision became the Commissioner's final decision.

**B.    Plaintiff's Age, Education and Work Experience**

Mr. Walter was born on April 11, 1966.  AR169.  Mr. Walters is a college graduate and a war veteran having served in Desert Storm/Desert Shield, Enduring Freedom and Iraqi Freedom.  AR547, 549.  In his medical records, Mr. Walter described many traumatic events that occurred during his military service.  AR393.  Dr. Bradshaw felt these traumatic events were "significant." AR394.  Prior to these events, Mr. Walter functioned at a high level.  AR396. Mr. Walter received an honorable discharge with the rank of Major from the United States Army following 24 years of service.  AR547.  In 2009, Mr. Walter retired from the military but "felt that he would have been Boarded out if had not." AR394.  He was having "night horror dreams" and missing at work and was told by his superior that he had to do something.  AR406, 408.  Mr. Walter has never abused substances.  AR394.  Mr. Walter's past relevant work was in information systems management for the United States Army.  AR547.

**C.    Relevant Medical Evidence**

During a compensation and pension examination completed by psychiatrist Dr. Samuel Bradshaw on January 11, 2010, Mr. Walter indicated that at one time he had many friends but is now down to just one and that was his wife.  AR394. Mr. Walter indicated he had difficulty going into crowds, had very labile feelings where he would cry one minute and then recover, was hyperirritable, easily startled, and had problems with getting to sleep.  AR394.  In addition, Mr. Walter complained he was sad constantly, had little energy, poor concentration, and did not have fun.  AR394.  Dr. Bradshaw stated Mr. Walter had no remissions in the last several years and that these symptoms had gone on for the last three years.

4

AR394.  Mr. Walter was somewhat anxious during the exam.  He was tearful, sad, and struggled with concentration at times.  AR395.  Mr. Walter indicated sleep impairment finding some relief with medications.  AR395.  Dr. Bradshaw indicated Mr. Walter met the Diagnostic and Statistical Manual for Mental Disorder – IV criteria in that he had recurrent re-experiencing, had few friends, stayed away from crowds, was hyperirritable, and rather upset most of the time.  AR395. Dr. Bradshaw diagnosed Mr. Walter with severe post-traumatic stress syndrome (PTSD) secondary to combat stressors, depressive disorder secondary to PTSD, and chronic fatigue.  AR395.  Dr. Bradshaw assigned a global assessment of function score (GAF) of 45.  AR395.

Dr. Bradshaw opined Mr. Walter had total occupational impairment as he was unable to concentrate, unable to focus, had repeated symptoms that kept him from completing any duties, had marked social impairment, and his only social relationship was his recently married wife, and "they are already having some difficulties."  AR396.

On January 27, 2010, Mr. Walter reported his most troubling symptom was intrusive thoughts.  AR433.  During the mental status exam his concentration was fair.  AR434.

On February 22, 2010, Dr. Hoerner concluded that the findings of the exam were consistent with a diagnosis of traumatic brain injury (TBI), "although the current clinical symptom presentation was most consistent with the effects of behavioral health conditions (e.g., PTSD, depression, etc.)"   AR369, 547-48.

During the TBI consult on February 22, 2010, Mr. Walter rated the following neurobehavioral symptoms as very severe: his concentration, difficulty making

decisions, difficulty getting organized and ability to finish things, fatigue, difficulty falling or staying asleep, feeling anxious, depressed, irritability, and poor frustration tolerance.  AR367.  Mr. Walter rated his forgetfulness as severe.  AR367.  Mr. Walter conveyed that these symptoms among others extremely interfered with his social interactions.  Id.

Mr. Walter underwent a detailed neuropsychological examination on March 11, 2010, secondary to complaints of worsening psychiatric symptoms, episodes of forgetfulness, poor concentration, fatigability, sleep disturbance, chronic pain, and headaches.  AR546.  During neuropsychological assessment Mr. Walter reported the onset of his psychiatric symptoms occurred following transition from the Persian Gulf in 1991.  AR548-49.  The test indicated "a mild level of cognitive dysfunction characterized by impaired executive skills."  AR545.  At the time of assessment Mr. Walter endorsed the following symptoms: recurrent nightmares; insomnia; feelings of guilt; avoidance behaviors; emotional lability; heightened irritability; hypervigilance; depressed mood; poor energy; and appetite reduction with 25-pound weight loss.  AR549.  The physician observed Mr. Walter's thought processes were mildly circumstantial, but he could be redirected.  AR549.  During the neuropsychological testing Mr. Walter had difficulty concentrating and required frequent redirection.  AR550.  Mr. Walter exhibited mild cognitive defects in executive function.  AR552.  His psychomotor processing speed was borderline impaired and was in the borderline impaired range of mental flexibility and visual scanning.  AR552.  Mr. Walter has moderately impaired in retention of information.  AR552.  Mr. Walter's occupational and social functioning would be mitigated by his psychiatric status.  AR553.

6

On March 18, 2010, Dr. Silverman diagnosed Mr. Walter with PTSD, depressive disorder and likely traumatic brain injury. AR485. Mr. Walter reported to Dr. Silverman that his concentration and memory problems were significant. AR485. Mr. Walter missed his appointment a day earlier and went to an appointment that was scheduled for a different day. AR485. Mr. Walter reported his wife handled his medications, he avoided leaving the house, and often did not want to get out of bed in the morning, and that he got tearful easily and often. AR485. Dr. Silverman noted Mr. Walter's mood was "up and down" and affect was anxious, and tearful on one occasion. AR485.

On March 24, 2010, an MRI scan of Mr. Walter's brain was interpreted as abnormal with "mild periventricular hyperintensity and multiple scattered T2/FLAIR bright signals in bilateral frontal and parietal lobe subcortical and deep white matter." AR548. The pattern was "nonspecific" and "could represent posttraumatic change or early microvascular ischemic change." AR548.

Mr. Walter reported having three good days during an April 5, 2010, TBI screening follow-up with Dr. Hoerner. AR540. His wife felt he was spending too much time in the house and he reported that going out and interacting with the public was difficult because of his irritability. AR540.

On April 29, 2010, he presented for a follow up of PTSD with Dr. Santos. AR494. During the exam he reported his thoughts as being "scrambled." AR496. During a physical on May 3, 2010, Mr. Walter presented as tangential and loquacious. AR427. His mood was elevated and he was grandiose in demeanor. AR427. Mr. Walter was hypomanic. AR428.

On May 18, 2010, Dr. Silverman noted Mr. Walter reported feeling terrible, that his wife was frustrated with his memory problems and didn't like being around him. AR482. During the exam Dr. Silverman noted Mr. Walter's speech sometimes increased in volume and his mood was terrible. Mr. Walter was frustrated and tearful.

Dr. Silverman noted on August 25, 2010, that Mr. Walter reported mood cycles where he would feel good for 3 to 4 days and then felt bad, that his anger control was very bad, he had high anxiety and that his sleep was ok with Trazodone except that he usually woke up in 3-4 hours. AR480. Mr. Walter's speech sometimes increased in volume, his motor activity was restless, his mood was terrible, he was frustrated and tearful and his thoughts were mildly tangential. AR480.

During a compensation and pension examination on October 21, 2010, Mr. Walter admitted to "violent" mood swings. AR386. Mr. Walter's medical history indicated difficulty staying and falling asleep, sleeping 15 hours a day at times, decreased attention, difficulty concentrating, difficulty with executive functions (speed of information processing, goal setting, planning, organizing, prioritizing, etc.), moderate memory impairment and irritability, and restlessness which interfered with relationships. AR386. His psychiatric manifestations included flight of ideas, loquaciousness and narcissism. AR388.

On November 23, 2010, Mr. Walter had a psychiatry consult with Dr. Santos. AR406. In response to questions regarding psychological or emotional problems in the past 30 days, Mr. Walter stated he experienced serious depression, anxiety or tension, and trouble understanding, concentrating or

8

remembering.  AR407.  When asked to spell WORLD backward, he did it "by repeated the spelling again and again world D, world L, world R."  AR409. Mr. Walter could only remember one of three words.  AR409.  Mr. Walter remembered RED but did not remember APPLE.  AR410.  When Mr. Walter was given instructions, he wrote himself notes because he would not remember otherwise.  AR410.  Mr. Walter indicated he had short term memory problems due to intrusive thoughts.  AR411.  For PTSD, Mr. Walter endorsed a score of 72 and for depression Mr. Walter scored 19.  AR409.  Mr. Walter's diagnosis was PTSD and mood disorder, depressed and he was given (GAF) of 50-55.  AR409. Dr. Santos found it "difficult to figured (sic) this gentleman getting to rank of Major."  AR410.

On December 17, 2010, Mr. Walter stated he liked spending time in his favorite place, his garage.  AR534.  He reported he wrote things down and tried to do things, but his wife got irritated.  AR534.  He reported irritability was a big issue for him.  AR534.  Mr. Walter only remembered 2 of 5 words.  AR534. Dr. Santos felt Mr. Walter was in a plateau.  AR536.  Mr. Walter reported he mostly woke up two times on average and went back to sleep, but the Trazodone helped.  AR536.

On February 22, 2011, Mr. Walter reported his family life was affected by his "lack of emotions."  AR532.  Mr. Walter only remembered 2 of 5 words.  AR533. His mood was consistent with his mental disorder.  AR533. Mr. Walter reported that he usually woke up two times and went back to sleep as the Trazodone helped.  AR533.

On April 26, 2011, Mr. Walter reported some days were better and some were not. AR529. Mr. Walter reported it took him about 25 minutes to one hour to go to sleep. AR529. Mr. Walter only remembered 2 of 5 words. AR530.

On October 6, 2011, Mr. Walter reported some days were better and some were not. AR526. Mr. Walter only remembered 2 of 5 words. AR526.

On December 20, 2011, Mr. Walter voiced concerns regarding organization and that he struggled and needed to work harder. AR523. Mr. Walter reported he spent a lot of time in his house and fixed his motorcycle and tried to keep his mind occupied. AR523. Mr. Walter only remembered 2 of 5 words. AR524. Mr. Walter's mood was consistent with his mental disorder. AR524.

On March 20, 2012, Mr. Walter reported he had messed up big time because he overspent twice. AR520. He was in anger management with Dr. Offenbach. AR520. During the exam he appeared distressed. AR522.

During follow up for PTSD with Dr. Santos on June 26, 2012, Mr. Walter reported he "takes it one day at a time" and must keep organized because of his cognitive problems. AR518. Mr. Walter only remembered 2 of 5 words. AR518.

During a follow up appointment on October 9, 2012, Mr. Walter indicated the Quetiapine[4] made him feel like staying in bed all day. AR515. He reported he was still dealing with anger control and that his thoughts tended to race. AR515.

---

[4] Quetiapine is also known as Seroquel. It is used to treat bipolar disorder and major depressive disorder in adults. Some of the side effects of Quetiapine include dizziness, drowsiness, and feeling tired. https://www.emedicinehealth.com/drug-quetiapine/article_em.htm (last accessed August 6, 2018).

During the exam, Mr. Walter was pleasant, but Dr. Santos could tell he was stressed and it was difficult for him to keep this façade. AR516.

On November 6, 2012, Dr. Santos met with Mr. Walter after he got out from the PTSD support group because the support group was very important in Mr. Walter's treatment and Dr. Santos' appointment conflicted with the support group schedule.  AR512.  Mr. Walter reported he was again not sleeping well when he was off the Trazodone.  AR512.  During the exam, Mr. Walter was sleepy because he was not sleeping as well at night.  AR513.

On December 5, 2012, Mr. Walter reported the Trazodone helped him sleep but the problem was that he felt tired during the first portion of the day.  AR509. He was sleepy during the exam.  AR510.

During a follow up for PTSD on March 12, 2013, Mr. Walter reported having bad gory dreams.  AR506.  He reported he only takes the Quetiapine if the nightmares did not permit him to go back to sleep and he needed to rest. AR506. He reported the nightmares were at their least intensity.  AR506.

On June 9, 2013, Mr. Walter presented for a follow up of PTSD with Dr. Santos.  AR503. Mr. Walter reported he was having bad gory dreams but not the nightmares.  AR503.  During the exam he was sleepy and had not taken care of his personal care because he had not wanted to be late for his appointment. AR504.  He was working in group therapy to try and improve his appearance and get out more.  AR505.  Mr. Walter wrote everything down as a way of reminding himself of things.  AR505.

On October 29, 2013, he reported that he realized he needed to spend more time outside his house and that his oldest son must push him out the door to go

do something.  AR500.  He reported that coming to see Dr. Santos helped with his intrusive thoughts.  AR500.  He presented with a scruffy appearance and was working in group therapy to try and improve his appearance.  AR501-02. Mr. Walter did not write things as he did not bring a notebook but when reminded by Dr. Santos, he wrote some on his med sheet.  AR502.

As late as January 17, 2014, Mr. Walter reported that he spent most of his time in his basement and avoided going out on his own because he did not trust anyone.  AR475.  Mr. Walter reported his main problem was still anger.  AR475.

On February 3, 2014, Mr. Walter came to his appointment with a sheet of paper with several issues to address.  AR488.  Mr. Walter noted ongoing issues with PTSD and admitted to being "all over the place today."  AR488.

During another follow up on March 12, 2014, he presented as obviously depressed and voiced some sense of worthlessness.  AR497. His appearance was scruffy.  AR498.

On October 31, 2014, he presented for follow up of PTSD with Dr. Santos. AR491.  Mr. Walter was taking his meds as his son wrote them on the caps. AR492.  Mr. Walter's hair was long, curly and wild in appearance.  AR493.  He reported his thoughts as "scrambled."  AR493.

On March 15, 2016, during group session Mr. Walter reported noticing rumination when he is in bed, while driving, and while sitting on the couch and he tried to listen to the radio or keep his mind busy to distract himself.  AR646.

On March 22, 2016, Mr. Walter completed the BDI-II which measures current symptoms of depression.  AR628.  His score was 34 indicating a severe

12

level of depression.  AR633.  He reported he had noticed more traumatic memories than rumination in the last week.  AR644.

On March 31, 2016, during an appointment with Dr. Santos, Mr. Walter had a wild appearance with hair messed and he wore a long coat and gloves as he felt it was cold outside.  AR635.

On April 19, 2016, Mr. Walter completed the BDI-II which measures current symptoms of depression.  AR628.  His score was 35 indicating a severe level of depression.  AR628.  Mr. Walter reported he was still struggling with rumination.  AR628.

On August 23, 2016, Mr. Walter saw Dr. Santos.  AR607. Mr. Walter reported he was sleeping with his medications but felt he was sleeping more than he should.  AR607.  His sleep was interrupted by dreams.  AR607.  He reported he was having intrusive thoughts and tried to sing songs from tv shows to distract himself.  AR607.  His physical appearance was improved.  AR608-09.  Mr. Walter reported when he had a bad night with dreams he was more irritable. AR609.

On June 28, 2017, Mr. Walter saw Dr. Santos and reported he felt he was sleeping more than he should and his sleep was interrupted by dreams. AR613. He reported intrusive thoughts and tried to sing tv songs to distract himself. AR613.  He was attending group therapy and when it was announced they would be talking about convoys, it brought memories and "him having to deal the subject a week ahead of the group and wonder how he will handle [it] etc."  AR613-14. Mr. Walter reported feeling down and he took Prazosin when he felt disturbed by nightmares.  AR614.  He presented with wild appearance and hair that was

messed and he wore a long coat and gloves as he said that he felt it was cold outside.  AR615.

**D.    Evidence Submitted to the Appeals Council**

Evidence submitted to the Appeals Council included an addendum from Dr. Santos dated March 1, 2017.  AR9.  Dr. Santos is Mr. Walter's treating psychiatrist and has been since 2010.  Id.  Dr. Santos opined that Mr. Walter's PTSD would make it difficult for Mr. Walter to be functional and "he is seriously limited with difficulties in memory and would have difficulty in working on (sic) proximity with others as he does not respond well to criticism."  Id.  Dr. Santos further opined that Mr. Walter would be unable to complete a working day with his impairment and is unable to maintain socially appropriate behaviors.  Id.  Dr. Santos opined that Mr.  Walter's condition is permanent, and that his chronic depression has "magnified" his physical injuries.  Id.  Finally, Dr. Santos noted that Mr. Walter had been retired from the United States Army since 2009 and "had not worked in years."  Id.

**E.    Summary of Testimony**

Mr. Walter testified at the hearing held on March 22, 2017.  Mr. Walter's responses to questions posed by the ALJ are often disjointed and rambling.  AR40-52.

In response to the ALJ asking if he had problems concentrating,  Mr. Walter answered yes.  AR45.  Mr. Walter stated that he watches a lot of TV and tries to keep his mind occupied so he does not get any bad thoughts of "war and stuff" in his head and will start to ruminate.  AR45.

The ALJ asked Mr. Walter if medication helped his night terrors.  AR46.
Mr. Walter answered "it doesn't fix it but it does curb it a little."  AR46-47.  When
asked about being out in crowds, Mr. Walter replied, "I don't do that" and that he
does not go to Walmart.  AR46.  The ALJ asked if Mr. Walter had any friends and
Mr. Walter indicated his son Joe and the doctors at the VA.  AR47.

Mr. Walter said he spends a lot of time in his basement and that he had a
motorcycle and that he just "cleans it."  AR47.

Mr. Walter said he cooked his own meals but couldn't leave the kitchen if
the stove was on because his son Joe told him not to.  AR48.

Mr. Walter was planning to get a medical discharge from the military, but a
VA veteran's service officer told him to just retire normally.  AR50.

The ALJ questioned the vocational expert (VE) as follows:  the ALJ asked the
VE to assume a person with Mr. Walter's age, education and work experience.
AR55.  He further asked the VE to assume such a person was limited to light duty
work.  Id.  The person could lift 20 pounds occasionally, 10 pounds frequently,
and would be limited to standing and walking for 4 hours in an 8-hour day but
could sit for up to 6 hours in an 8-hour day.  Pushing and pulling limitations were
the same as lifting and carrying.  Id.  The person could only occasionally climb
ladders, ropes, scaffolds, ramps and stairs.  Id.  the person could occasionally
reach overhead with the left non-dominant upper extremity.  Id.  The person could
understand and remember simple instructions, carry out routine and repetitive
tasks, and was limited to simple, work-related decisions.  Id.  He could tolerate
changes within a routine work setting and could occasionally interact with the
public, co-workers, and supervisors.  AR55.  Given this hypothetical, the VE

15

opined such a person could not perform Mr. Walter's past relevant work.  Id.  The VE opined, however, that such a person that jobs remained within the national economy in the light, unskilled category that such a person could perform.  AR56.

For example, such a person could perform the job of electronics worker, DOT 726.687-010.  In the regional economy (Minnesota, North Dakota, South Dakota) there existed between 1,200 to 1,500 such positions.  Id.  In the national economy, there existed approximately 40,000 such positions.  Id.

Another job that fit the hypothetical was assembler, small products.  DOT 706.684-022.  Id.  This job is also considered light duty, unskilled work.  Id.  Regionally, the VE estimated there were 600 to 700 positions available, and nationally, upwards of 20,000 positions available.  Id.

The ALJ's second hypothetical asked the VE to assume the same limitations, except the person was limited to sedentary work, with the same non-exertional limitations.  AR57.  Assuming these limitations, the ALJ stated such a person could perform the jobs of circuit board screener, DOT 726.684-110.  AR 58.  For that job, there would be 300-400 regional positions and 12,000 positions nationally.  Id.  Such a person could also perform the job of final assembler, DOT 713.687-018.  That job would have 250 openings regionally and 9,000 nationally.  Id.  Another suitable job would be a lens inserter, DOT 713.687-026.  Such a job would have 200 openings regionally, and 8,000 in the national economy.  Id.

The vocational expert testified that a person who is unable to maintain concentration for a two-hour period would not be able to perform competitive work.  AR58.  The vocational expert also testified that a person who missed two or more days of work per month would not be able to maintain competitive

16

employment.  AR58.  In addition, the vocational expert testified that a person limited to no interaction with public, co-workers or supervisors would not be able to perform competitive work.  AR59.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala 3 F.3d 1210, 1213  (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala,

17

2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

**B.     The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

18

**Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments  the applicant is not disabled and  the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett 777 F.2d at 1320, n.2.  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine
whether a severe mental impairment meets or equals a Listing.
20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If  the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.    20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Mr. Walter asserts the Commissioner erred by finding him not disabled within the meaning of the Social Security Act.  He asserts (1) the Commissioner erred when evaluating whether Mr. Walter's mental impairments met or medically equaled the severity of a listed impairment, and (2) the Commissioner erred in improperly evaluating the impact of Mr. Walter's PTSD and depression on his ability to work.[5]

―――――――――――――

[5]Because Mr. Walter did not raise any issue on appeal regarding his physical impairments, the court does not discuss Mr. Walter's physical impairments in this opinion.

The Commissioner asserts substantial evidence supports the ALJ's determination that Mr. Walter was not disabled during the relevant time frame and the decision should be affirmed.

**E.    Analysis**

Mr. Walter's arguments are addressed in turn below:

**1.    Whether the Commissioner Erred When Evaluating Whether Mr. Walter's Impairments Met or Medically Equaled the Severity of a Listed Impairment?**

"The burden of proof is on the [claimant] to establish that his or her impairment meets or equals a listing." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  To meet a listing, an impairment must meet all of the criteria that are specified by the listing.  Id.

**a.  Requirements to Meet a Listing**

Mr. Walter asserts the ALJ erred by not finding his mental impairment (PTSD) met or equaled the severity of a Listed impairment under 20 C.F.R. part 404, Subpart P, Appendix 1.  Specifically, Mr. Walter asserts his PTSD met or equaled Listing § 12.15-Trauma and stressor related disorders.[6]  Mr. Walter asserts he satisfied the A, B, and C criteria for this listing, even though it is only necessary to satisfy either the A and B or A and C criteria.  To analyze this argument, the court reviews the requirements for meeting the Listing under § 12.15—Trauma-and stressor-related disorders.

---

[6] The ALJ specifically considered but rejected the possibility that Mr. Walter's PTSD met the Listing level impairment for Listing § 12.15.  AR17-19. In so doing, the ALJ discussed only the B and C criteria.  Mr. Walter asserts that because the ALJ did not discuss the A criteria, the ALJ implicitly conceded the A criteria were met. The Commissioner does not contest this assertion.

The Social Security regulations explain that generally, mental disorders have A, B, and C criteria requirements.  See 20 C.F.R. part 404, Subpart P, Appendix 1 (hereinafter "Listings"), §12.00, Mental Disorders.

The A criteria requirements of each Listing (except § 12.05-Intellectual disorders) includes the medical criteria that must be present.

The B criteria for each Listing (except § 12.05-Intellectual disorders) provide the functional criteria in conjunction with a rating scale, to evaluate how the claimant's mental disorder limits his functioning in a work setting.  These areas of mental functioning include: (1) understanding, remembering, and applying information; (2) interacting with other people; (3) concentrating, persisting or maintaining pace; and (4) adapting or managing oneself.  To satisfy the B criteria, the claimant's mental disorder must result in extreme limitation in one, or marked limitation in two of the four areas of mental functioning. See Listing § 12.00A(2)(b).

Understanding, remembering and applying information requires the ability to learn, recall and use information to perform work activities.  Examples include understanding and learning terms, instructions and procedures; following one- or two step oral instructions to carry out a task, describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.  See Listing § 12.00E(1)

The ability to interact with people refers to the ability to relate to and work with supervisors, co-workers, and the public.  Examples include: cooperating with others; asking for help when needed; handling conflicts with others, stating one's

own point of view; initiating or sustaining a conversation; understanding and responding to social cues (physical, verbal and emotional); responding to requests, suggestions and criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. See Listing § 12.00E(2).

The ability to concentrate, persist or maintain pace refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary route and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. See Listing § 12.00E(3).

The ability to manage oneself refers to the abilities to regulate emotions, control behavior, and maintain well-being in the work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. See Listing §12.00E(4).

Each of these criteria are rated on a five-point scale, as having no limitation, mild limitation, moderate limitation, marked limitation or extreme limitation.  <u>See</u> Listing § 12.00F(1)-(2).

No limitation means the claimant is able to function independently, appropriately, effectively, and on a sustained basis.  <u>See</u> Listing § 12.00F(2)(a).

Mild limitation means the claimant functions independently, appropriately, effectively, and on a sustained basis but is slightly limited.  <u>See</u> Listing §12.00F(2)(b).

Moderate limitation means the claimant's ability to function independently, appropriately, effectively, and on a sustained basis is fair.  <u>See</u> Listing § 12.00F(2)(c).

Marked limitation means the claimant's ability to function independently, appropriately, effectively, and on a sustained basis is seriously limited.  <u>See</u> Listing §12.00F(2)(d).

Extreme limitation means the claimant is not able to function in this area independently, appropriately, effectively, and on a sustained basis. <u>See</u> Listing § 12.00F(2)(e).

Finally, and importantly, the SSA stresses in its regulations that "the medical evidence may include descriptors regarding the diagnostic stage of your disorder, such as 'mild' or 'moderate.' Clinicians may use these terms to characterize your medical condition.  However, these terms will not always be the same as the degree of your limitation in paragraph B of mental functioning."  <u>See</u> Listing §12.00F(3)(a).

24

The C criteria of several of the mental disorder listings (including § 12.15-Trauma-and stressor-related disorders) provides the criteria the SSA uses to evaluate serious and persistent mental disorders.  <u>See</u>, Listing §12.00A(2)(c).  To satisfy the C criteria, the disorder must be serious and persistent—in other words, there must be a medically documented history that the disorder has existed for at least two years, and evidence that satisfies the criteria in both C1 and C2.

The C criteria are further explained in Listing §12.00G.  For example, the C1 criteria is satisfied when the evidence shows the claimant relies on an ongoing basis upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting, to diminish the symptoms and signs of his mental disorder.  The SSA takes into consideration periods of inconsistent treatment or lack of compliance with treatment that may result from the mental disorder itself.  <u>See</u> Listing § 12.00G(2)(b).

The C2 criteria are satisfied when the evidence shows that, despite the claimant's diminished symptoms and signs, he has achieved only marginal adjustment.  "Marginal adjustment" means the claimant's adaptation to the requirements of daily life is fragile; that is, he has minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  The SSA will consider that a claimant has achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of symptoms and signs and to deterioration in the claimant's functioning; for example, the claimant has become unable to function outside of his home or a more restrictive setting without substantial psychosocial supports.  Such a deterioration may have necessitated a significant change in medication or

25

other treatment.  Evidence may document episodes of deterioration that have required the claimant to be hospitalized or be absent from work, making it difficult to sustain work activity over time.  See Listing §12.00G(2)(c).

If a claimant meets all the requirements of a Listing, it is not necessary to conduct any vocational analysis.  This is because his disability is considered so severe that he is *presumed* to be unable to perform *any* type of work.

> The Listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  But, "merely being diagnosed with a condition named in a Listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the Listing. 'An impairment that manifests only some of [the Listing] criteria, no matter how severely, does not qualify.' " Lott v. Colvin, 772 F.3d 546, 549 (8th Cir. 2014) (quoting McCoy v. Astrue, 648 F.3d 605, 611-12 (8th Cir. 2011) (quoting Zebley, 493 U.S. at 530)).

Returning to the specific Listing Mr. Walter asserts the ALJ should have found was satisfied (Listing § 12.15-Trauma-and stressor-related disorders), this Listing indicates it can be met by satisfying either the A and B or the A and C criteria.  See Listing § 12.15.  Mr. Walter asserts he meets this Listing because he satisfied the requirements in either fashion.  In other words, he asserts he meets all the requirements for the A, B, and C criteria.

The A criteria for Listing § 12.15 requires medical documentation for all of the following:

26

(1) exposure to actual or threatened death, serious injury or violence;

(2) Subsequent involuntary, re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks);

(3) Avoidance of external reminders of the event;

(4) Disturbance in mood and behavior;

(5) Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).

To meet the B criteria for Listing § 12.15, Mr. Walter must show he has extreme limitation in one, or marked limitation in two of the following areas of mental functioning:

(1) Understand, remember, or apply information;

(2) Interact with others;

(3) Concentrate, persist, or maintain pace;

(4) Adapt or manage oneself.

To meet the C criteria of § 12.15, Mr. Walter must show his mental disorder is "serious and persistent" (that he has medically documented history that his mental disorder has existed for at least 2 years) and that there is evidence of both:

(1) Medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of his mental disorder; and

(2) Marginal adjustment, that is that he has minimal capacity to adapt to changes in his environment or to demands that are not already a part of his daily life.

See Listing § 12.15A, B, & C.

### b.  The ALJ's Listing Analysis

The ALJ specifically considered, but rejected Mr. Walter's claim regarding Listing level impairment for Listing § 12.15.  See AR17-19.  As mentioned above, this judge accepts, and the Commissioner does not contest, Mr. Walter's claim that by failing to discuss the A criteria, the ALJ implicitly conceded Mr. Walter met the A criteria.

The ALJ did, however, discuss whether Mr. Walter met the B and C criteria. AR17-19.  Beginning with the B criteria, the ALJ first cited Mr. Walter's April, 2010, neuropsychological evaluation by Dr. Franklin.  AR17.  The ALJ noted that this exam showed only "mild cognitive loss."  Id.  (citing EX 2F, p. 257 or AR544).

The court further reviews this evaluation, which is found at AR544-56. It appears Mr. Walter was referred to Dr. Franklin by Dr. Hoerner for a comprehensive neuropsychological evaluation following his evaluation for a traumatic brain injury.   AR544.  Mr. Walter reported a history of multiple, mild traumatic brain injuries and a diagnosis of PTSD and depression.  Id.  He complained of worsening psychiatric symptoms, memory loss, reduced concentration, sleep disturbance, and chronic pain.  Id.  Dr. Franklin administered a battery of  neuropsychological tests  on March 11, 2010.  Id.  The overall duration of the evaluation was eight hours.  AR 546.  Mr. Walter returned on April 8, 2010, to receive the results.  Id.

Mr. Walter arrived early and was unaccompanied.  AR 549.  He was well-dressed with adequate attention to hygiene and grooming.  Id.  He appeared his stated age.  Id.  He walked slowly with a cane.  Id.  His eye contact was normal and he was consistently friendly, well-mannered and polite.  Id.  His overall affective

presentation was euthymic.  Id.  He was alert and oriented in all spheres.  Id.  His speech was normal in rate, rhythm, volume and prosody.  Id.  He had no problems with word retrieval.  Id.  Auditory comprehension appeared to be normal for complex questioning and conversation.  Id.  Thought processes were mildly circumstantial, but he could be redirected and did not perseverate on any given topic.  Id.  There was no evidence of psychotic thought or behavior.  Id. at 550.  He was an adequate historian who was able to provide detailed history of his medical and psychiatric conditions.  Id.

During the testing process, Mr. Walter remained cooperative and courteous though he had difficulty concentrating and required frequent redirection, to which he responded favorably.  Id.  He appeared to exert his best effort toward all tasks. Id.  The test results were considered to be valid.  Id.  The tests administered to Mr. Walter were as follows:

1.  Wide Range Achievement Test, 4th Ed.: Word Reading subtest;
2.  Wechsler Adult Intelligence Scale, 3d Ed. (WAIS-III): abbreviated form consisting of administration of five subtests (e.g. vocabulary, similarities, block design, arithmetic, and digit span);
3.  Wechsler Memory Scale, 3d Ed. (WMS-III): Selected Subtests (e.g. Logical memory, verbal paired associates, and faces);
4.  Boston Naming Test, 2d Ed. (BNT-2);
5.  Controlled Oral Word Association Test (COWAT);
6.  Trail Making Test (TMT): Parts A and B;
7.  Rey Fifteen Item Test (RFIT);
8.  21 Item Test.

These tests were designed to measure general intelligence and broad neuropsychological domains of attention and concentration, auditory and visual learning and memory, language, executive functions, problem-solving, and visual-spatial abilities.  AR550.

The results of the WAIS-III test showed Mr. Walter's general intellectual functioning to be in the upper range of high average.  AR551.  His performance on neuropsychological indices of attention/concentration, mental control, and speed was consistently intact.  Id.  He was able to recall six digits forward and four digits backwards.  Id.

On the WMS-III test (learning and memory functioning) Mr. Walter performed within the average range.  Id.  On the COWAT test, Mr. Walter obtained an average score.  AR552.  His speech was clear and fluent.  Id.  On the BNT-2 test (object confrontation naming) his score was in the low average range.  Id.  Mr. Walter's executive functioning (higher order cognitive processes which involve the initiation, planning, sequencing, organization, and control of behavior), was variable.  AR552.  He received a superior score (99th percentile) on an abstract special construction task test contained within the WAIS-III test.   Another test within the WAIS-III (verbal reasoning and concept formation) was within the 75th percentile.  Id.  However, his score on the psychomotor processing speed portion of the test fell within the borderline impaired range, at the 3rd percentile.  AR552.  He was also borderline impaired (6th percentile) on the mental flexibility and visual scanning portion of the test, which required alternation and sequencing between letters and numbers.  Id.

In the summary portion of the neuropsychological exam, Dr. Franklin made the following observations:  Overall, Mr. Walter is a bright individual who is currently exhibiting relatively mild cognitive deficits in executive functions of unclear etiology.  AR 552.  Although these scores are within borderline impaired to low average ranges, they likely represent a decline for [Mr. Walter] whose estimated

premorbid abilities are above average.  AR552-53.  Dr. Franklin suggested that

Mr. Walter may experience improvement in his cognitive status and quality of life

"with consistent psychiatric services, counseling, and treatment of his chronic

pain and sleep disturbance."   AR553.

Next, the ALJ cited Mr. Walter's compensation and pension examination

(conducted in January, 2010, by Dr. Bradshaw at the Veteran's Administration)

which indicated Mr. Walter had "moderate functional impairment."  AR18 (citing

EX 2F, p. 101 or AR388).

The court further reviews the compensation and pension examination,

which appears at AR384-396.  In the examination, Mr. Walter reported several

incidents of head injury in which he hit his head and/or lost consciousness for a

short period of time.  AR384-85.  Mr. Walter reported difficulty falling and staying

asleep, but also reported sleeping fifteen hours at a time on occasion.  AR386.  He

also reported fatigue.  Id.  He reported violent mood swings.  Id.  He also reported

moderate memory impairment.  Id.  Cognitively, Mr. Walter reported decreased

attention, difficulty concentrating, and difficulty with executive functions.  He also

endorsed irritability and restlessness, which interfered with his relationships.

AR386.  He appeared thin and well-groomed.  AR387.  He demonstrated flight of

ideas, loquaciousness and narcissism.  AR388.  The objective evidence on testing

revealed moderate impairment of memory, attention, concentration, or executive

functions resulting in moderate functional impairment.  AR388.  Mr. Walter's

judgment was normal.  Id.  His social interaction was routinely appropriate.  Id.

He was occasionally disoriented to one of the four aspects (person, place, time,

situation).  Id.  Mr. Walter articulated three or more subjective symptoms that

moderately would interfere with work or instrumental activities of daily living, or family or other close relationships.  Id.  Examples were marked fatigability, blurred or double vision, and headaches requiring rest periods each day.  Id.  Mr. Walter was able to communicate by spoken and written language.  Id.

Dr. Bradshaw described some of the traumatic events which occurred during Mr. Walter's military service.  AR393.  Mr. Walter described having nightmares to Dr. Bradshaw that, though they were once very frequent, were by then "down to two or three times a week."  Id.  Mr. Walter was sleeping better then with the help of Trazodone.  Id.  He had intrusive thoughts that came on about every eight minutes.  Id.  The thoughts were accompanied by terror, anger and guilt.  Id.  He denied flashbacks.  AR394.

Mr. Walter expressed that his only friend was his wife and even she complained he was somewhat distant from her.  Id.  He had trouble going into crowds.  Id.  He complained about being hyperirritable and having problems getting to sleep.  AR394.  He was constantly sad and depressed.  Id.  He had little energy, poor concentration, and did not have fun.  Id.  The Trazodone, however, had helped a great deal with his sleeping.  Id.  He reported this had been going on for the past three years with no remission.  He indicated he was retired but felt he would have been "boarded out" if he had not retired.  Id.[7]

_____

[7] If a Soldier's physician finds it apparent that the Soldier's condition may permanently interfere with his/her ability to serve on active duty, the treating physician will recommend the Soldier to the Medical Evaluation Board (MEB) and the Physical Evaluation Board (PEB), which is governed by the U.S. Army Physical Disability Evaluation System (PDES).

At the time of this evaluation, Mr. Walter had only been discharged from the Army for a few months.  AR394.  Mr. Walter reported not having been able to work.  Id.  He reported few social relationships.  Id.  His outpatient medical care was mostly medications.  Id.

Mr. Walter's mental status exam showed the following:  he was oriented in all spheres.  AR394-95.  His thoughts were goal-oriented.  AR395.  He had no cognitive problems.  Id.  He was, however, anxious, tearful, and sad.  He exhibited no impairment of thought process or communication.  AR 395.  He had no delusions or hallucinations.  Id.  He made eye contact, but described his discomfort in dramatic terms.  Id.  He had never been homicidal or suicidal.  Id.  He was well groomed and had no memory loss.  He did struggle with concentration.  Id.  He demonstrated no ritualistic or obsessive behavior.  Id.  His speech patterns were normal.  Id.  He was depressed and anxious but demonstrated no panic attacks.  He had good impulse control.  Id.  His sleep was impaired and medication helped only somewhat.  Id.

---

The MEB determines whether or not a Soldier's medical condition enables him/her to continue to meet medical retention standards in accordance with Army regulations, such as AR 40-501: Standards of Medical Fitness.  It also provides an opportunity for military physicians to clearly document the Soldier's medical condition and any duty limitations. If the MEB findings and recommendations stipulate that the Soldier does not meet retention standards or should return to duty in a different military occupational specialty (MOS), the Soldier is referred to the PEB, who formally determines if the Soldier is fit for continued military service and his/her subsequent eligibility for disability compensation.

http://wct.army.mil/modules/soldier/s6-medicalBoards.html (last accessed August 6, 2018).

Dr. Bradshaw concluded Mr. Walter met the DSM-IV criteria for severe post-traumatic stress disorder (PTSD), secondary to combat stressors.  AR395.  Dr. Bradshaw also diagnosed depressive disorder, not otherwise specified, secondary to PTSD.  Id.  Dr. Bradshaw noted Mr. Walter was intelligent and quite capable of managing his affairs.  AR396.  He also noted, however, that Mr. Walter had "significant" PTSD symptoms and a decrease in his ability to do both his work and social activities.  Id.  Under the section of the report which asked Dr. Bradshaw to comment upon Mr. Walter's occupational and social functioning, Dr. Bradshaw wrote:

> This man has total occupational impairment.  He is unable to concentrate.  He is unable to focus.  He has repeated symptoms that keep him from completing any duties.  He has marked social impairment and his only social relationship is his recently married wife, and they are already having some difficulties.

AR396.

Next, the ALJ noted Mr. Walter had been cited as having "average" intelligence (citing EX 2F, p. 246 or AR 533, treatment note from Dr. Santos dated February, 2011).  The ALJ noted that during his routine mental health visits, Mr. Walter was not noted to have difficulty with comprehension or cognition.  The ALJ observed that Mr. Walter's own description of his activities of daily living (working on his motorcycle, doing small repairs for his mother), were consistent with only moderate limitations in understanding, remembering, or applying information AR 17 (citing Exhibit 3F, pp, 39, 50 or AR 622,633—case management notes from the Veteran's Administration dated May, 2016 and March, 2016).  The ALJ concluded these self-described tasks demonstrated Mr. Walter's ability to

perform multi-step tasks and further supported a finding of only "moderate" limitations in understanding, remembering or applying information. AR17.

The ALJ discussed Mr. Walter's ability to interact with others and concluded Mr. Walter had moderate limitations in this area. AR18. The ALJ conceded Mr. Walter reported irritability and anger (citing EX 2F, p. 188, 193 or AR475, 480—mental health treatment notes from the Veteran's Administration dated December, 2013 and January, 2014) and that he reported he was anxious at times (citing EX 2F, p. 198 or AR 485—mental health note from the Veteran's Administration dated March, 2010). However, the ALJ noted, Mr. Walter participated well in group therapy and was close to his family (citing EX 2F, pp. 207 and EX 3F, p. 50 or AR 294, 633—Dr. Santos' note dated April, 2014 and March, 2016). For all these reasons, the ALJ concluded Mr. Walter was only "moderately" limited in his ability to interact with others. AR18.

The ALJ determined Mr. Walter's ability to concentrate, persist and maintain pace was likewise only moderately limited. AR18. Again in support of this conclusion, the ALJ cited Mr. Walter's ability to work on his motorcycle. Id. The ALJ also cited Mr. Walter's ability to watch TV—both of these activities in the ALJ's estimation were "demanding of sustained attention." Id. Though the ALJ conceded Mr. Walter was noted to be "somewhat tangential," the ALJ did not believe the record indicated he was overly distractible (citing EX 2F, p. 198 or AR 485—Veteran's Administration mental health note dated March, 2010).

Next, the ALJ evaluated Mr. Walter's ability to adapt or manage himself. AR18. The ALJ concluded Mr. Walter also had moderate limitations in this category. Id. The ALJ conceded Mr. Walter's grooming habits were "slightly

substandard" but not significantly (citing EX 2F generally—AR288-583—

Mr. Walter's Veteran's Administration medical records).    Additionally, the ALJ

acknowledged "some anger issues," (citing EX 2F, p. 188, or AR 475—Veteran's

Administration progress note dated January, 2014).    However, the ALJ noted,

Mr. Walter was able to live independently, and the record did not suggest he

engaged in reckless behavior.    Therefore, the ALJ concluded Mr. Walter was only

moderately limited in his ability to adapt or manage himself.

The ALJ concluded that because Mr. Walter's mental impairments did not

cause at least two "marked" limitations or one "extreme" limitation, the B criteria

were not satisfied.    AR18.

Next, the ALJ considered whether the C criteria were satisfied.    AR18.    The

ALJ noted in his written decision that Mr. Walter's anger issues and appearance

deteriorated in 2014 around the time of his divorce and that his stress increased

at the death of his brother (AR23), but that later in 2014, Mr. Walter's appearance

had improved and that he maintained his sense of humor.    Id. (citing EX 2F,

p. 188, 207, 209, or AR 475, 494, 496—Veteran's Administration medical records

dated January 2014, and April, 2014).

The ALJ noted Mr. Walter's ability to cope with great stressors such as

divorce and death.    Id.    The ALJ did not believe the record supported the

conclusion that Mr. Walter had only "marginal" ability to adjust, but instead that

the record showed Mr. Walter was generally able to cope and respond

appropriately to changing demands and pressure.    AR18.    As such, the Listing

requirements for Listing § 12.15—Trauma-and stressor-related disorders were not

met.    AR18.

### c. The ALJ's Listing Analysis is Supported by Substantial Evidence

In support of his argument that the ALJ erred by failing to find he met the criteria for Listing level impairment of Listing § 12.15, Mr. Walter asserts the ALJ "cherry picked" the record by only selectively citing his VA medical records.

For example, the ALJ concluded Mr. Walter's self-described tasks of tinkering on his motorcycle and fixing things around his mother's house demonstrated Mr. Walter's ability to perform multi-step tasks and further supported a finding of only "moderate" limitations in understanding, remembering or applying information. AR17. Mr. Walter asserts the ALJ mischaracterized the evidence as to his ability to understand, remember and apply information. See, Docket 11, p. 17. Mr. Walter indicates he only cleans his motorcycle, not repairs it, citing his hearing testimony AR47.

The ALJ concluded Mr. Walter was only "moderately" limited in his ability to interact with others. AR18. Mr. Walter, however, responds that participating in group therapy with fellow veterans is a far cry from successfully re-entering the work force and interacting all day, every day with strangers. Docket 11, p. 17.

As for the ALJ's determination that Mr. Walter's ability to concentrate, persist, and maintain pace was only moderately limited, again Mr. Walter disagrees. Mr. Walter cites the extreme difference between the amount of concentration required to clean one's motorcycle or watch TV and the amount of concentration required to successfully engage in full-time employment. Docket 11, p. 18.

As for the ALJ's determination that Mr. Walter was only moderately limited in his ability to adapt or manage himself, Mr. Walter asserted the ALJ overlooked or ignored significant record evidence.  For example, Mr. Walter cites Dr. Bradshaw's comment that Mr. Walter has "marked social impairment." AR396. Mr. Walter also directs the court to AR367.  That record contains statements from Mr. Walter himself, indicating that his PTSD symptoms "extremely" interfered with his social interactions.  He also directs the court to Dr. Santos' March 1, 2017, addendum, which states that  Mr. Walter's "unstable emotional condition" led to the destruction of his marriage.  AR9.  Mr. Walter also directs the court to the totality of Dr. Santos' addendum, which opines: (1) Mr. Walters is seriously limited with difficulties in memory; (2) would have significant difficulty in working in proximity to others; (3) would be unable to complete a work day; and (4) his traumatic war experiences interrupt his normal organizational thought processes. AR9.

Mr. Walter also suggests the ALJ should have considered that during his neuropsychological testing, Mr. Walter had difficulty concentrating and required frequent redirection.  AR550.  Psychological factors impacted his mental skills. AR266.  He reported tearfulness, concentration and memory problems, and social difficulty.  AR485.  He reported "scrambled" thoughts to Dr. Santos in 2010. AR494.  He presented as tangential and loquacious during a physical in May, 2010.  AR427.  His demeanor was grandiose.  Id.  His wife did not want to be around him.  AR482.  His mood was terrible, and he was frustrated.  Id.

During a session with Dr. Santos, Mr. Walter could only remember one out of three words.  AR409.  He could remember RED but not APPLE.  AR410.  He

38

reported that irritability was a big problem for him.  AR534.  In several sessions

with Dr. Santos, Mr. Walter could remember only two out of five words.  AR518,

524, 526, 530, 535.  In several of Dr. Santos' office notes from October, 2013,

March 2014, and October, 2014, he recorded that Mr. Walter's hair/appearance

was "long," "scruffy" or "wild."  AR498, 501, 493.

This court has carefully considered all of Mr. Walter's criticisms regarding

the ALJ's determination that Mr. Walter was "moderately" rather than "markedly"

or "extremely" limited in each of the categories of the B criteria.  First, the court

notes the definition of "moderate" limitation denotes a limitation that is not

insignificant. The regulations indicate a "moderate" limitation means the

claimant's ability to function as to the particular criteria on a sustained basis is

only "fair."  See 20 C.F.R. part 404, Subpart P, Appendix 1, 12.00, Mental

Disorders, 12.00F.2.c. Conversely, the definitions of "marked" and "extreme"

connote a very high level of dysfunction and are quite difficult to meet.  "Marked"

means the claimant's ability to function  is  seriously limited, while extremely

limited means the claimant cannot function at all.  See Listing §12.00F(2)(d) & (e).

Second, the ALJ acknowledged many of the items Mr. Walter brings to the

attention of the court.  For example, regarding Mr. Walter's ability to interact with

others, the ALJ acknowledged Mr. Walter's reports of irritability and anger, and his

self-reports of anxiousness. AR18.  Regarding Mr. Walter's ability to concentrate,

and maintain pace and persistence, the ALJ acknowledged that Mr. Walter's

treating physicians had noted he was somewhat tangential. AR18.  Regarding

Mr. Walter's ability to manage himself and adapt appropriately, the ALJ

acknowledged Mr. Walter's personal grooming habits were "slightly substandard"

and that he had some anger issues.  AR18.  Nevertheless, the ALJ observed,

Mr. Walter lived independently and had not demonstrated any reckless behavior.

AR18.   The ALJ is not required to cite every piece of evidence in the record.

Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010).  Though he did not cite

every piece of evidence, the  ALJ's written opinion makes clear that he did read

and consider the VA medical records in determining Mr. Walter's B criteria

limitations rose to the level of "moderate" rather than "marked" or "severe."

Finally, though the VA medical providers did occasionally use the terms

"marked" or "serious" to describe Mr. Walter's social or memory skills, the court is

instructed by the SSA's own regulations that "the medical evidence may include

descriptors regarding the diagnostic stage of your disorder, such as 'mild' or

'moderate.' Clinicians may use these terms to characterize your medical condition.

However, these terms will not always be the same as the degree of your limitation

in paragraph B of mental functioning."  See Listing §12.00F(3)(a).

The ALJ also determined that Mr. Walter did not satisfy the C criteria.

AR18.  In so doing, the ALJ noted Mr. Walter had been able to cope with major

stressors in his life (death, divorce) and that the record did not reflect that as a

result of these major stressors, Mr. Walter has been left with only "marginal"

ability to adjust.  Id.  This determination is likewise supported by substantial

evidence.

Returning to the Regulations, in order to meet the C2 criteria, the claimant

must show that despite his diminished symptoms, he has only "marginal

adjustment" ability.  This means that the claimant's adaptation to the

requirements of daily life is fragile; that is, he has minimal capacity to adapt to

changes in his environment or to demands that are not already part of his daily life.

The SSA will consider that a claimant has achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of symptoms and signs and to deterioration in the claimant's functioning; for example, the claimant has become unable to function outside of his home or a more restrictive setting without substantial psychosocial supports. Such a deterioration may have necessitated a significant change in medication or other treatment. Evidence may document episodes of deterioration that have required the claimant to be hospitalized or be absent from work, making it difficult to sustain work activity over time. See Listing § 12.00G(2)(c).

After independently reviewing the record, the finds that Dr. Santos regularly adjusted Mr. Walter's medications. However, the ALJ's decision that the C2 criteria was not met is supported by substantial evidence. In other words, there is insufficient evidence that the medication changes made by Dr. Santos were necessitated by exacerbated symptoms brought on by a deterioration in Mr. Walter's function which was in turn triggered by increased demands upon Mr. Walter—such as his divorce or the death of his brother.

In fact, Mr. Walter's mental health medications remained fairly consistent at his request, even after his divorce and the death of his brother. See e.g. AR 492-94 (medications continued the same at Mr. Walter's request on his first visit with Dr. Santos after the death of Mr. Walter's brother in October, 2014); AR 494-96 (Mr. Walter reported in April, 2014, that his divorce was final and that he had

discontinued one of his medications altogether; Dr. Santos adjusted the dose of one medication and kept the dose of another medication the same).

Likewise, despite the emotionally traumatic events in his life (his divorce and the death of his brother), Mr. Walter's functioning never deteriorated to the level that he required hospitalization or an inability to live on his own. The court concludes the ALJ's determination that the C criteria for Listing § 12.15 were not met is supported by substantial evidence.

Therefore, because Mr. Walter did not meet all the requirements for either the B or the C criteria, the ALJ's determination that Mr. Walter did not meet the requirements for the Listing § 12.15 (Trauma-and-stressor related disorders) is supported by substantial evidence.

### 2. The Commissioner's RFC Formulation Is Supported by Substantial Evidence.

Mr. Walter's next assignment of error is that the ALJ failed to consider how his mental symptoms impact his ability to work. In other words, that the ALJ improperly formulated Mr. Walter's RFC. In formulating Mr. Walter's RFC, the ALJ gave "little weight" to the opinions of Mr. Walter's treating physicians from the VA medical facilities, while purporting to give "great weight" to the non-treating, non-examining state agency physicians who had opined about Mr. Walter's mental abilities for purposes of denying Mr. Walter's disability claim at the initial and reconsideration levels. See AR 65-66, 69-71 (Dr. Buchkoski at the initial level); AR79-79-82, 86-87 (Dr. Helmer at the reconsideration level).

Interestingly, neither of the state agency physicians identified PTSD as a severe impairment. AR65, 79, 82. Nor did they evaluate Listing § 12.15 (Trauma-

and-stressor related disorders) when evaluating the B and C criteria of the Listings.  Id.  The ALJ, however, did identify PTSD as a severe impairment, and the ALJ did evaluate the B and C criteria for Listing § 12.15 (Trauma-and-stressor related disorders), along with Listing § 12.04.  See AR17-18.  That the state-agency physicians did not evaluate § 12.15 under the Listings is harmless error, however, because the Commissioner has conceded that Mr. Walter has met the A criteria of that Listing, and the B and C criteria for Listing § 12.15 are identical to the B and C criteria for § 12.04 (Affective disorders) and § 12.06 (Anxiety disorders)—both of which were evaluated by the state agency physicians, whose opinions the ALJ adopted.[8]

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."  Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982),

---

[8] There seems to be some disagreement in the medical community about whether PTSD should or should not be classified as an anxiety disorder.  See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3234302/ (last accessed August 7, 2018).  Because the state agency physicians discussed PTSD in their notes supporting their opinions but did not classify it as a separate mental impairment, it appears to this court that the state agency physicians included PTSD within the classification of anxiety disorders.

abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[9] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and

---

[9] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight."  Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  Id. at n.8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id.  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real

people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

Mr. Walter generally asserts it does not make sense for the ALJ to cite to the examinations from the VA (the neuropsychological examination and compensation and pension exam), but discount the conclusions reached by the VA physicians (based on those very same exams) that Mr. Walter is disabled. But this result is mandated by the SSA's own regulations. See 20 C.F.R. § 404.1504.

That regulation explains that though an ALJ must *consider the evidence* that supports disability decisions by other agencies (such as the VA), the ALJ is not bound by disability *determinations* made by those other agencies. This is because those agencies use different rules to make their determinations. Id.

That is exactly what the ALJ said when he explained why he gave the VA's determination of Mr. Walter's 100% disability "little weight" even though he had cited extensively to the VA medical records and disability examination findings during his discussion regarding Mr. Walter's functional abilities. See Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006). In Pelkey, the claimant, like Mr. Walter, claimed error by the ALJ's failure to consider the VA's disability rating determination. Id. at 579. The Eighth Circuit disagreed, because though the ALJ did not specifically mention the VA's disability rating, the ALJ had fully considered and discussed the evidence underlying the VA's conclusions. Id. It was not inconsistent, therefore, for the ALJ to consider the evidence contained within the

46

VA's evaluations, while at the same time rejecting the disability rating conclusions reached within those evaluations.  In this case, the medical records upon which the ALJ relied were exclusively from VA physicians and the reports from which the VA's disability ratings sprung.  Additionally, the ALJ specifically mentioned, but rejected, the disability rating that was endorsed by the VA for Mr. Walter.  It necessarily follows, therefore, that the ALJ specifically considered the evidence from the VA evaluations as is required by Pelkey.

In Dillon v. Colvin, 210 F. Supp. 3d 1198 (D.S.D. 2016), the case was remanded to the SSA because the ALJ failed to consider the VA's determination that the claimant was 100% disabled.  Id. at 1209-10.  In Dillon, the case was remanded because, though the state agency physicians upon whose opinions the ALJ relied had reviewed the VA records, the ALJ did not explicitly mention the VA rating in his opinion or explain why he was not adopting it.  Id. at 1210.  The Dillon court explained that though the ALJ is not required to adopt the VA's disability rating, it was important enough to deserve "explicit attention."  Id. (citing Morrison v. Apfel, 146 F. 3d 625, 628 (8th Cir. 1998).  In Dillon, the court concluded the case law requires more of the ALJ than just reviewing the same records that the VA doctors did—the ALJ must explicitly mention and weigh the VA disability rating in order to comply with 20 C.F.R. § 404.1504.  Dillon, 210 F. Supp. 3d at 1210-11 (collecting cases).  Here, the ALJ has met the standard laid out in Dillon because the ALJ both reviewed the underlying records and explicitly mentioned the VA disability rating before describing why he declined to adopt it.  For these reasons, this court will not reverse the ALJ's RFC formulation for his

failure to wholesale adopt the VA's disability rating.  That, however, does not end the inquiry.

The ALJ gave "little weight" to the opinion of Mr. Walter's treating VA physicians and "great weight" to the opinions of the non-treating, non-examining state-agency physicians.  The ALJ did not have the supplemental opinion of Dr. Shontos, but the Appeals Council did, and the Appeals Council rejected Mr. Walter's request for reconsideration, making the ALJ's decision the final decision of the Commissioner.

Where, as in this case, new and material evidence is submitted on appeal to the Appeals Council and made part of the record, this court on appeal considers the new evidence and attempts to determine what the ALJ would have decided had the ALJ had the benefit of the new evidence before it.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000); Mackey v. Shalala, 47 F.3d 951, 952 (8th Cir. 1995); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994); Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); and Browning v. Sullivan, 958 F.2d 817, 822-23 (8th Cir. 1992).  Accordingly, even though the new and material evidence was not before the ALJ when it rendered its decision, this court considers the entire record, new evidence included, in determining if substantial evidence in the record supports the ALJ's decision.

The non-treating, non-examining state agency physicians evaluated Mr. Walter initially on July 12, 2016, for affective disorders and anxiety related disorders (Listings § 12.04 and § 12.06). AR65-66.  The state agency physicians' opinions clearly indicate they address Mr. Walter's mental impairments as they

existed only throughout the relevant time period (i.e. ending on December 31,

2014) See e.g. AR69.

At the initial level, the state agency physician (Dr. Buchkoski) stated both

the anxiety and affective orders were severe, but assigned only mild restrictions on

Mr. Walter's activities of daily living, moderate restrictions on his ability to

maintain social functioning, moderate restrictions on his ability to maintain

concentration, persistence and pace, and no repeated episodes of decompensation.

AR66.  Dr. Buchkoski did not believe the C criteria were met.  Id.

For further explanation of this opinion, Dr. Buchkoski observed Mr. Walter

had a history of traumatic brain injury and reported some slight memory problems

to providers.  AR66.  Mr. Walter had participated in group therapy, psychiatry and

psychology at the VA.  Id.  He'd had "ups and downs" with depression and had

taken medication for his depression, and also to help him sleep.  Id.  Some

obsessive rituals had been reported by providers.  Id.  He had impaired thinking

and memory at times.  Id.  He had reported depression and problems leaving his

home at times.  Id.  MSEs[10] had not reported impairments that limited all types of

work.[11]  Mr. Walter was always oriented.  His thoughts were scrambled at times.

---

[10] Mental status examinations.

[11] When a treating physician opines that a claimant's impairments render
him disabled or *unable* to work, the Commissioner argues such a determination is
reserved solely to the Commissioner.  See 20 C.F.R. § 1527(d)(1).  The reverse also
holds true.  In other words, the state agency physician's note that Mr. Walter's
mental impairments do not limit employment cannot be taken as conclusive
evidence that Mr. Walter *is able* to work.

He had some anger issues at times.  He had no panic attacks.  His speech was normal.  He was able to make eye contact.  He had no suicidal or homicidal intent. AR66.

Dr. Buchkoski then referred the reader to the MFRC.[12]  That assessment is found at AR69.  Dr. Buchkoski opined Mr. Walter did have understanding and memory limitations, but rated such limitations as "not significantly limited." AR69. He rated Mr. Walter's ability to remember locations and work-like procedures as "not significantly limited."  Id.  He rated Mr. Walter's ability to understand and remember short and simple instructions as "not significantly limited."  Id.  He rated Mr. Walter's ability to understand and remember detailed instructions as "moderately limited."  Id.  When asked to explain these restrictions in narrative form, Dr. Buchkoski stated, "claimant is able to complete 3-4 step instructions. Some slight memory and concentration problems noted on exams in the file."  Id.

When asked if Mr. Walter had sustained concentration and persistence limitations, Dr. Buchkoski said "yes."  AR 69.  Dr. Buchkoski opined, however, that Mr. Walter's ability to carry out very short and simple instructions was not significantly limited.  Id.  His ability to carry out detailed instructions, however, was moderately limited.  AR70.

Mr. Walter's ability to maintain concentration for extended periods was also moderately limited.  Id.  His ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance was not

---

[12] Mental Residual Functional Capacity.

significantly limited.  Id.  His ability to sustain an ordinary routine without supervision was not significantly limited.  Id.

Mr. Walter's ability to work in coordination with or in proximity to others without being distracted by them was not significantly limited.  Id.  His ability to make simple, work-related decisions was not significantly limited.  Id.  His ability to complete a normal workday without interruptions from psychologically based symptoms and to perform at consistent pace without an unreasonable number and length of rest periods was not significantly limited.  Id.  When asked to explain these findings, Dr. Buchkoski stated, "claimant is able to attend to and concentrate on at least simple tasks."  Id.

When asked if Mr. Walter had limitations in his ability to interact socially, Dr. Buchkoski said "yes."  AR70.  Dr. Buchkoski said Mr. Walter's ability to interact appropriately with the public was "moderately limited."  Id.  His ability to ask simple questions or ask for assistance was "not significantly limited."  Id.  His ability to accept instructions and respond appropriately to criticism from supervisors was "moderately limited."  His ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was "not significantly limited."  Id.  His ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness was "not significantly limited."  Id.  When asked to explain these findings in further detail, Dr. Buchkoski stated, "claimant reports some problems with anger and getting along with others in the records.  He would work best in an environment that involves limited contact with the public and colleagues."  Id.

Dr. Buchkoski opined Mr. Walter did not have adaptive limitations.  Id.
When asked for any additional explanation for the MRFC in general,
Dr. Buchkoski stated, "claimant has had situational stressors that have impacted
function.  He has received treatment for his symptoms and shown response. He is
seen as being able to function if limitations noted above are taken into
consideration." AR71.

At the reconsideration level, Vilma Helmer, MD, reviewed Mr. Walter's
mental impairments.  Again at the reconsideration level, Dr. Helmer did not
identify PTSD as a severe impairment, but did identify anxiety disorder and
affective disorder as severe impairments.  AR79.  Dr. Helmer affirmed
Dr. Buchkoski's findings at the initial level.  AR85-86.

Dr. Helmer made more detailed notes regarding the explanation for the
psychiatric review technique, citing treatment notes from Drs. Silverman and
Hoerner. AR80-81.  Also, Dr. Helmer noted that Dr. Bradshaw's evaluation
showed no impairment of  Mr. Walter's thought process or communication skills.
AR86.  He had no memory loss, but did struggle with concentration trouble at
times.  Id.

Dr. Helmer also noted Dr. Hoerner's evaluation, which showed only mild
cognitive deficits which should be expected to improve with psychiatric care.
AR87.  Then, Dr. Helmer pointed to psychiatric records which showed that
Mr. Walter's condition did in fact improve with psychiatric care.  For example,
Dr. Helmer noted that from November, 2012, through 2013, Mr. Walter reported
that he was feeling better and his focus was improved.  AR87.  In October, 2013, (a
little over a year before his date last insured) Mr. Walter's physician reported that

Mr. Walter was "the best I have seen him" and that Mr. Walter was more focused, interactive, and his thoughts were not racing.  Id.  In April, 2014, even after he knew his wife was divorcing him, Mr. Walter presented as feeling better and laughing with decreased irritability.  Id.

In support of his argument that the Commissioner failed to properly consider his mental impairments in formulating his RFC, Mr. Walter relies heavily on the supplemental note from Dr. Shontos (AR9).  This medical record was not before the ALJ, but was submitted to the Appeals Council.  It was dated March 20, 2017, though Dr. Shontos made clear he had treated  Mr. Walter since 2010.  About this evidence, the Appeals Council stated "we find this evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not consider and exhibit this evidence."  Id.  In other words, the Appeals Council did not find the evidence new and material.

Giving the proper deference to the Commissioner, and considering the evidence as a whole, the court finds Dr. Shontos' supplemental letter does not tip the scale in Mr. Walter's favor.  In other words, assuming the ALJ had considered Dr. Shontos' letter, the ALJ's decision regarding Mr. Walter's mental RFC would still have been supported by substantial evidence.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;

53

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the
claimant;

--whether the person giving the medical opinion treated the
claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence,
especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician
provides supporting explanations for their opinions and
the degree to which these opinions consider all the
pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical
issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the
opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th

Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-

supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500

F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at  920); 20 C.F.R. §

404.1527(c).  "A treating physician's opinion 'do[es] not automatically control,

since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting

Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).  The length of the treating

relationship and the frequency of examinations of the claimant are also factors to

consider when determining the weight to give a treating physician's opinion.  20

54

C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' "
this is one factor that can support an ALJ's decision to discount or even disregard
a treating physician's opinion. <u>House</u>, 500 F.3d at 744 (quoting <u>Bentley</u>, 52 F.3d
at 786; and citing <u>Wagner</u>, 499 F.3d at 853-854; <u>Guilliams v. Barnhart</u>, 393 F.3d
798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has
examined a claimant is entitled to more weight than the opinion of a source who
has not examined a claimant." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 (8th Cir.
2006) (citing 20 C.F.R. §§ 404.1527)); <u>Shontos v. Barnhart</u>, 328 F.3d 418, 425 (8th
Cir. 2003); <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating
physicians, the ALJ must resolve the conflict. <u>Wagner</u>, 499 F.3d at 849.
Generally, the opinions of non-examining, consulting physicians, standing alone,
do not constitute "substantial evidence" upon the record as a whole, especially
when they are contradicted by the treating physician's medical opinion. <u>Wagner</u>,
499 F.3d at 849; <u>Harvey v. Barnhart</u>, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing
<u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of
non-examining, consulting physicians along with other evidence in the record form
the basis for the ALJ's decision, such a conclusion may be supported by
substantial evidence. <u>Harvey</u>, 368 F.3d at 1016. Also, where a nontreating
physician's opinion is supported by better or more thorough medical evidence, the
ALJ may credit that evaluation over a treating physician's evaluation. <u>Flynn v.
Astrue</u> 513 F.3d 788, 792 (8th Cir. 2008)(citing <u>Casey v. Astrue</u>, 503 F.3d 687,
691-692 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight

accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Even if Dr. Shontos' supplemental opinion letter is considered, the Commissioner's RFC determination is supported by substantial evidence. Dr. Shontos' letter indicated Mr. Walter's condition had declined, that it is permanent, and that he had not worked since his 2009 retirement from the military. Dr. Shontos explained he began treating Mr. Walter in 2010, but the letter is dated in March, 2017. Mr. Walter bears the burden of proving his condition became disabling on or before December 31, 2014. It was therefore necessary for Dr. Shontos to clearly explain Mr. Walter's mental impairments as they existed on or before December 30, 2014. Though Dr. Shontos' letter contains many general conclusions regarding the severity of Mr. Walter's mental impairments, it does not clearly indicate the treatment-based reasons for those those conclusions, nor whether Mr. Walter's mental impairments had reached the level of severity as described in Dr. Shontos' letter on or before December 30, 2014.

The state agency physicians, however, cited Mr. Walter's 2010 VA medical evaluations which opined Mr. Walter's mental condition would improve with psychiatric therapy, and cited the VA medical records indicating that it did improve. The state agency physicians opined that as of Mr. Walter's date last insured, though he was not capable of returning to his past relevant work as a military computer support specialist (AR250), he was capable of other substantial gainful employment that was less physically and mentally demanding.

56

Specifically, work that only required simple work-related decisions and occasional interactions with the public, co-workers and supervisors (AR85-86).

It rare that a non-treating, non-examining physician's opinion will carry the day in a social security case, but this is such a day.  Here, the ALJ gave "good reasons" for assigning significant weight to the opinions of the state agency physicians.  The ALJ explained that the state agency physicians recognized the VA treatment records and medical evidence which indicated Mr. Walter did not have significant cognitive impairments, was not overly anxious, or the like.  AR25.  Additionally, his treatment for mental impairments had been limited to medication management and group therapy.  Id.  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citing Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).  For these reasons, in this instance the nontreating physicians' opinions are supported by better or more thorough medical evidence, and the ALJ's decision to give them weight in determining Mr. Walter's mental RFC is supported by substantial evidence in the record.  Flynn 513 F.3d at 792.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, this magistrate judge hereby respectfully RECOMMENDS that the Commissioner's decision should be AFFIRMED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely

objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the

District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black,

781 F.2d 665 (8th Cir. 1986).

     DATED August 8, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge